735 S.E.2d 882

**In re K.R. and P.R.**

No. 11–0961.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 25, 2012.

Decided Nov. 20, 2012.

734

Amy C. Crossan, Esq., Bouchillon, Crossan & Colburn, L.C., Huntington, WV, for Petitioner.

David J. Lockwood, Esq., Lockwood & Lockwood, and Ryan Turner, Esq., Bellomy & Turner, L.C., Huntington, WV, for Respondent.

WORKMAN, Justice:

Petitioner, Kelly R. (hereinafter "Kelly" or "petitioner"), appeals the circuit court's May 23, 2011, order granting permanent guardianship of her two children, P.R. and K. R., to respondent Linda J. (hereinafter "Linda" or "respondent"), their paternal grandmother. Petitioner asserts that the circuit court erred in exercising jurisdiction under W. Va. Code § 48–20–101 *et seq.* (Repl.Vol.2009), the Uniform Child Custody Jurisdiction and Enforcement Act (hereinafter "the UCCJEA") and by transferring custody from a biological mother without a finding of unfitness. For the reasons set forth more fully below, we reverse the order of the circuit court awarding guardianship to Linda J., restore petitioner Kelly R.'s custodial rights, and remand this matter for further proceedings as indicated herein and as further consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

K.R., currently fourteen-years-old, and P.R., currently twelve-years-old, are the children of Kelly R. and James R. (hereinafter "James"), now deceased.[1] Kelly and James lived together in Mississippi with their children until their separation in August, 2006, and subsequent divorce in August, 2008. In October, 2008, P.R. and K.R. began residing

---

1. We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties. *See, e.g., West Virginia Dept. of Human Services v. La Rea Ann C.L.,* 175 W.Va. 330, 332 S.E.2d 632 (1985).

with Gary and Armilda M. (hereinafter the "M. family,"), who reside in Wayne County and are extended relatives of P.R. and K.R. P.R. and K.R. were brought to Wayne County to live with the M. family due to personal and financial hardships occasioned by the divorce of their parents who continued to live in Mississippi; they were enrolled in school in Wayne County at that time. In December, 2008, the M. family filed a guardianship petition in Wayne County seeking permanent guardianship of the children; they apparently alleged that Kelly and her live-in boyfriend at the time, Brian Y. were drug abusers. The circuit court found that, given that the family resided in Pearl River County, Mississippi, that Mississippi had jurisdiction over those issues and made referral to their "home jurisdiction" for handling of that matter. Child Protective Services in Mississippi, accepting the referral from Wayne County, investigated, finding that the home was adequate with food, that Kelly and her boyfriend, Brian Y., were working on their substance abuse problems, and that Kelly was not receiving support from the children's father, James R. Upon receipt of that information, the children were returned to the care of their mother in Mississippi in January, 2009, whereupon the Circuit Court of Wayne County, finding the matter properly in the hands of the children's home state, closed its file.[2]

Apparently for many years, Kelly and James permitted the children to spend the summer with James' mother, respondent Linda J., in Wayne County. Following their return to Mississippi in 2009, the children again returned to spend the summer with Linda in Wayne County, beginning in June, 2010.[3] The children would stay with Linda primarily, but on days when Linda worked late, they would spend the night with R. family member Sally S., a cousin to James.

In August, 2010, while the children were still in West Virginia, Kelly and James reconciled; the home they owned in Mississippi was foreclosed on and both moved to Louisiana. The precise date in August on which they moved is found nowhere in the record or briefs of the parties. At some point in August, Linda returned the children to Louisiana at the request of Kelly and they were enrolled in school there. Linda testified that they were returned to Louisiana at the "end of August," although the precise day they left West Virginia is found nowhere in the record. Linda testified that the children were gone from West Virginia for four weeks.

Approximately a month later, on October 4, 2010, James and Kelly executed a "Provisional Custody by Mandate" signing over temporary guardianship of the children to Sally S. and returned the children to Wayne County to be enrolled in school. Kelly testified—and it was undisputed—that Kelly and James intended to move to West Virginia in February, 2011, after James completed a chemical handling certification which would allow them to relocate. Their intended purpose in sending the children to West Virginia was to get them enrolled and integrated into school sooner than later. Linda testified that, as they did in the summer months, despite the Mandate vesting guardianship in Sally S., the children resided with both Linda and Sally S. intermittently depending on Linda's work schedule.

On January 10, 2011, James was killed in a workplace accident in Louisiana. Kelly returned to West Virginia on January 12, 2011, for his funeral services. She alleges that she verbally revoked the Mandate at that time. Regardless, it appears undisputed that for the next month, Kelly resided at the Pioneer Motel in Wayne with her youngest son, B., and either P.R. or K.R. at any given time.[4]

---

**2.** No portion of this file is contained in the Appendix, although the circuit court did read certain portions of the 2008 guardianship proceeding order into the record during the course of the hearing in the instant matter and incorporated certain references thereto in the order presently on appeal.

**3.** The circuit court's order found that their summer visit with Linda began in May, 2010, although Linda testified that they arrived in June.

**4.** B. is the child of Brian Y., the individual with whom Kelly was residing at the time of the first guardianship petition; at the time of the underlying proceedings, Kelly was pregnant with another of Brian's children. She testified that she would "go back and forth" between Brian and James throughout the period of her and James' reconciliation.

Kelly maintains that the R. family would not permit her to have both children with her at the same time; the R. family maintains that Kelly did not want both of them. On February 16, 2011, Kelly waited for the children to get off of the school bus with the intention of returning to Louisiana with them. It appears undisputed that the R. family learned of Kelly's plan to return to Louisiana and immediately retrieved the children from the bus, put them in a relative's home and refused to allow Kelly to take them to Louisiana. Kelly testified that the West Virginia State Police were called to intervene, but that she was told there was nothing they could do. Kelly then returned to Louisiana that day, alleging that members of the R. family followed her out of West Virginia.

Two days later, on February 18, 2011, Linda filed an emergency *ex parte* petition for guardianship of the children in Wayne County Family Court, pursuant to W. Va. Code § 48–5–513 [5] and an *ex parte* order was entered granting her emergency temporary guardianship. In the petition, Linda alleged that Kelly had a history of drug abuse, "has engaged in physical violence toward the children," and that she was residing with Brian Y., who also had a history of drug abuse. A hearing was set for one month later on March 18, 2011.[6] On March 7, 2011, Linda filed a supplement to her petition, alleging that the children had advised that Kelly and Brian would travel to Florida to obtain drugs for sale and distribution, as well as their personal use. The day before the hearing, Kelly appeared through counsel, filing an Answer, a motion to remove the matter to

circuit court, and a motion to dismiss. A hearing in family court was held on March 18, 2011, resulting in the family court transferring the matter to circuit court on the basis of the abuse and neglect allegations.[7]

The order entered in family court made the finding that the children had no home state and that the court was exercising jurisdiction on an emergency basis, ostensibly under the guise of W. Va.Code § 48–20–204(a) providing for "temporary emergency jurisdiction," although the family court never directly referenced the statute.[8] The order temporarily placed the children in Linda's custody until June 8, 2011, or until other order of the circuit court. A hearing in circuit court was then set for April 5, 2011, but continued upon Linda's motion due to a scheduling conflict of her counsel; Kelly's attorney agreed to the continuance. The adjudicatory hearing was held on April 14, 2011—nearly two months from the time of filing of the Petition.

At the conclusion of the April 14, 2011, hearing, the circuit court made the following findings of fact and conclusions of law. First, the circuit court determined that under the UCCJEA, the children had no "home state" [9] and that West Virginia could exercise jurisdiction "based on [the children's] residency over the past two (2) years," referencing the children's comings and goings in West Virginia, creating a *cumulative* presence in West Virginia of a little over seven months at the time of the hearing within the preceding two and a half years. The circuit court referenced extensively the previous

---

**5.** W. Va.Code 48–5–513 governs *ex parte* orders in divorce proceedings.

**6.** Rule 13 of the Rules of Practice and Procedure for Minor Guardianship Proceedings and Rule 48a of the Rules of Practice and Procedure for Family Court both provide that if a court learns that the basis of a petition for guardianship is an allegation of abuse and neglect, then the court "shall" remove the case to circuit court for hearing to be conducted within ten days "for determination of all issues." The statute under which the petition was erroneously filed—governing *ex parte* orders in divorce proceedings—requires a hearing to be held in twenty days. W. Va.Code § 48–5–513(b).

**7.** There is no transcript of the proceedings which occurred during this hearing included in the Appendix.

**8.** W. Va.Code § 48–20–204 grants temporary emergency jurisdiction if the child is present in the state and 1) has been abandoned; or 2) "it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." The family court's order stated that "the children are residing in West Virginia" and there were "emergency allegations."

**9.** However, later in the order when analyzing the best interests of the children, the court stated, "The children need stability and this is their home state."

guardianship petition by the M. family, the ultimate determination of Child Protective Services in Mississippi finding no abuse or neglect, and the resultant dismissal of the guardianship petition. The court found that since bringing the children back to West Virginia in October, 2010, the parents had made no contribution for their support, medical bills or education, but that "no requests for support were made."[10] With regard to the circumstances surrounding the children's presence in West Virginia, the court found that when Kelly attempted to return to Louisiana, "[t]he [R. family] did not want the children to go with her" and that Kelly "could have legally taken her children or proceeded by way of Court action to have her children returned to her," but did not.

The circuit court then determined that the best interests of the children were served by vesting Linda with permanent guardianship. Significantly, as to the basis of his ruling, the circuit court stated:

> The Court *does not find that Kelly [ ] is unfit*, nor that there was any evidence of abuse or neglect in Wayne County, West Virginia by Kelly [ ] or the caretakers. The Court did not believe that it had jurisdiction to rule on any substance abuse or domestic violence issues that may have occurred in either Mississippi or Louisiana, so no evidence was taken in this regard.[11] (emphasis and footnote added).

The court stated that it "limited the inquiry to the best interest of the children, and the circumstances of the children being present in West Virginia since October, 2010; and the stability of the children's home life." In that regard, it found that Kelly "provides an unstable environment for the children and has been guilty of educational neglect[.]"[12] The court then ordered that permanent guardianship should be placed with Linda, that Kelly should have unsupervised visitation as agreed by the parties, but was not permitted to take the children to Louisiana. However, the court noted that if Kelly moved to West Virginia, she could petition for custody and guardianship. This appeal followed.

## II. STANDARD OF REVIEW

■ This Court has held that with regard to custody decisions, including guardianships:

> " 'The exercise of discretion by a trial court in awarding custody of a minor child will not be disturbed on appeal unless that discretion has been abused; however, where the trial court's ruling does not reflect a discretionary decision but is based upon an erroneous application of the law and is clearly wrong, the ruling will be reversed on appeal.' Syllabus point 2, *Funkhouser v. Funkhouser*, 158 W.Va. 964, 216 S.E.2d 570 (1975), *superseded by statute on other grounds as stated in David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989)." Syl. Pt. 1, *In re*

---

**10.** This is significant only insofar as the overwhelming majority of the testimony adduced during the hearing was regarding whether or not Kelly financially provided for the children while they were in West Virginia. No allegations of abandonment were contained in the petition and at no time below did respondent affirmatively allege that petitioner had "transferred, relinquished or surrendered" custody pursuant to *Whiteman v. Robinson*, 145 W.Va. 685, 116 S.E.2d 691 (1960). *See* footnote 24, *infra*. Rather, the sole bases for guardianship identified in the petition and its supplement were allegations of a "history of drug abuse," "physical violence" against the children, and ongoing drug activity with Brian Y. Moreover, insofar as *jurisdiction* is concerned, as discussed in footnote 14 *infra*, "abandonment" is relevant only to exercise of "temporary emergency jurisdiction" pursuant to W. Va.Code § 48–20–204.

**11.** Without further explanation, the circuit court further noted its dismissal of Steve Bragg, the guardian ad litem appointed by the family court,

without a report or testimony. At the hearing, as discussed *infra*, the circuit court announced that it had no intention of hearing testimony regarding any allegations of activity which occurred outside of West Virginia or prior to October, 2010, when the children were returned to West Virginia under the care of Sally S. Mr. Bragg informally represented to the court that the drug abuse allegations were the entirety of the scope of information he gleaned from the children; therefore, the circuit court dismissed him. No other party called him as a witness.

**12.** This finding is apparently based on testimony from Linda that the children started school three weeks late in Louisiana when she returned them in August, 2010. Kelly denied this and maintained that school began there after Labor Day. There was no definitive evidence adduced either way.

*Abbigail Faye B.*, 222 W.Va. 466, 665 S.E.2d 300 (2008).

Syl. Pt. 2, *In re Antonio R.A.*, 228 W.Va. 380, 719 S.E.2d 850 (2011).

## III. DISCUSSION

Petitioner makes six separate assignments of error: (1) that the circuit court erred in exercising jurisdiction under the UCCJEA; (2) that the circuit court erred in exercising jurisdiction; (3) that the circuit court erred in divesting petitioner of custody; (4) that the circuit court erred by releasing the guardian ad litem; (5) that the family court erred in awarding temporary custody to respondent pursuant to W. Va.Code § 48–5–512 and 513; and (6) that the family court erred by failing to timely remove the guardianship petition to circuit court. Because we find error with both the Court's exercise of jurisdiction and failure to apply the proper legal standards applicable to transfer of custody from a natural parent, we find it unnecessary to address the remaining assignments of error.[13]

13. Specifically, we find it unnecessary to address at length errors three through six.

First, as to the dismissal of the guardian ad litem, although we find the basis of the court's dismissal of the guardian ad litem concerning, particularly given the erroneous conclusion that the abuse and neglect allegations were of no moment in the proceeding, this issue is appropriately addressed elsewhere in this decision. *See* Section III(B) n. 25, *infra*. As to the statute under which the family court issued its temporary emergency order, we find that despite its failure to specifically reference the statute under which it was acting, its exercise of temporary emergency jurisdiction under these circumstances was proper.

Moreover, although this Court finds it unnecessary to substantively address the remaining assignment which has been mooted by lapse of time, we note with grave concern the apparent disregard of procedural requirements requiring prompt removal and timely hearing of matters involving abuse and neglect by the lower courts involved in this matter. We caution courts that these procedural requirements are among our most vital safeguards for the protection of children and are not to be disregarded or made victim of the court's docket.

14. Respondent also argues that jurisdiction is proper in West Virginia because petitioner "abandoned" the children by failing to provide for support. This argument is without merit

## A. Jurisdiction under the UCCJEA

Petitioner's first substantive assignment of error is that the circuit court erred in exercising jurisdiction over respondent's petition for guardianship. Petitioner argues that jurisdiction was proper in Louisiana, where Kelly was residing at the time of filing of the petition. In support, petitioner maintains simply that "the home state of the child follows that of their parent." Respondent, on the other hand, asserts that the children's continuous presence in West Virginia since June, 2010, save for a brief return to Louisiana, establishes jurisdiction.[14] As noted above, the circuit court found that the children had no home state under the UCCJEA and that jurisdiction was proper in West Virginia as a result of their cumulative presence in the state during the two-year period preceding the adjudication hearing.[15]

Jurisdiction for guardianship proceedings is exclusively governed by W. Va.Code § 48–20–101 *et seq.*, West Virginia's codification of the UCCJEA.[16] While the parties make a few passing references to the UCCJEA, both fail to properly frame the issues presented

inasmuch as "abandonment" is only a ground for exercise of "temporary emergency" jurisdiction under W. Va.Code § 48–20–204. It is clear that the adjudication hearing conducted on April 14, 2011, was for the purpose of determining permanent guardianship and was no longer of a "temporary" or "emergency" nature as were the orders entered by the family court on February 18, 2011, and March 23, 2011.

15. However, during the hearing, the court's analysis was far simpler and appeared to be based on the children's presence in the state, alone:

I don't believe that these children have established a home state in either Mississippi or Louisiana at this time, or even West Virginia. But they are here in West Virginia currently. So, that gives this Court jurisdiction to deal with issues that resulted from this removal from the guardianship case.

16. The parties cursorily discuss the *venue*-giving language in W. Va.Code § 44–10–3(a), which concerns appointment of guardians, as follows: "The circuit court or family court of the county in which the minor resides, or if the minor is a nonresident of the State, the county in which the minor has an estate, may appoint as the minor's guardian a suitable person." Obviously, however, this venue language is inapplicable to a jurisdictional determination.

by the circuit court's exercise of jurisdiction in this matter under the construct of the UCCJEA. We find that the parties' arguments in this regard are not merely overly simplistic, but rather, ignore the plainly established framework contained in the UCCJEA. Likewise, we find that the circuit court, while making passing reference to a variety of operative terms contained throughout the statute, similarly failed to make the proper findings and perform the proper analysis to establish its jurisdiction.

W.Va.Code § 48–20–201(b) provides that "[s]ubsection (a) of this section is the exclusive jurisdictional basis for making a child custody determination by a court of this State." [17] W. Va.Code § 48–20–201(a) provides:

> Except as otherwise provided in section 20–204 [§ 48–20–204], a court of this State has jurisdiction to make an initial child custody determination only if:
>
> (1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding, and the child is absent from this State but a parent or person acting as a parent continues to live in this State;
>
> (2) A court of another state does not have jurisdiction under subdivision (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under section 20–207 [§ 48–20–207] or 20–208 [§ 48–20–208], and:
>
> (A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and
>
> (B) Substantial evidence is available in this State concerning the child's care, protection, training and personal relationships;
>
> (3) All courts having jurisdiction under subdivision (1) or (2) of this subdivision

have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under section 20–207 [§ 48–20–207] or 20–208 [§ 48–20–208]; or

> (4) No court of any other state would have jurisdiction under the criteria specified in subdivision (1), (2) or (3) of this subsection.

As such, but for the exercise of "temporary emergency" jurisdiction as provided in Section 204 of the UCCJEA, to exercise jurisdiction to determine child custody, a court of this state must satisfy one of the four bases of jurisdiction set forth in Section 201(a). These four bases have been aptly summarized as 1) "home state" jurisdiction; 2) "significant connection" jurisdiction; 3) "jurisdiction because of declination of jurisdiction"; and 4) "default" jurisdiction. *See Rosen v. Celebrezze,* 117 Ohio St.3d 241, 883 N.E.2d 420, 427 (2008). These jurisdictional bases do not operate alternatively to each other, but rather, in order of priority—reaching the next basis of jurisdiction only if the preceding basis does not resolve the jurisdictional issue. We address each in turn, applying the somewhat complicated facts of this case to illustrate the proper analysis to be performed before exercising jurisdiction.

## 1. Home State Jurisdiction

We begin with priority "home state" jurisdiction. As we recognized in Syllabus Point 3 of *Rosen v. Rosen,* 222 W.Va. 402, 664 S.E.2d 743 (2008):

> Pursuant to West Virginia Code § 48–20–102(g) (2001), "home state" means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period.

**17.** A "child custody determination" is defined as "a judgment, decree or other order of a court providing for the legal custody, physical custody or visitation with respect to a child. The term includes a permanent, temporary, initial and modification order." W. Va.Code § 48–20–102(c).

As such, to establish home state jurisdiction as a result of living with a parent, the operative period of time which must first be analyzed is the six-month period "immediately before" the commencement of a child custody proceeding.[18]

In the instant case, the child custody proceeding was commenced on February 18, 2011; the operative period is therefore from August 18, 2010 to February 18, 2011. During this period, the children did not live in any particular state for the entire six-month duration. In fact, there is no state in which the children lived with a parent or "person acting as a parent" for an uninterrupted, consecutive six-month period since before June, 2010.

The question is then presented as to how the six-month period immediately preceding the commencement of the proceeding is to be analyzed. The emphasis on where the child lived "six consecutive months *immediately before*" commencement of the action, as set forth in the definition of "home state" in W. Va.Code 48–20–102(g) (emphasis added), appears somewhat at odds with the jurisdiction-creating language in W. Va.Code § 48–20–201(a)(1) which provides that jurisdiction lies if this State is the child's home state on the date of commencement of the proceeding or "was the home state of the child *within* six months before the commencement of the proceeding[.]" Most states addressing this inconsistency have held that the statute does not require a child to live in the state where the action is commenced for the entire six-

month period immediately preceding the action, but rather requires a determination if the child lived in a state which qualifies as his or her "home state" at any time within six months before the proceeding.[19] In so finding, some courts have determined that Section 201(a)(1) "modifies and enlarges" the definition of home state, *Welch–Doden*, 42 P.3d at 1173. Others have found that to construe it otherwise would render the "within six months" language in Section 201(a)(1) "meaningless." *Celebrezze*, 883 N.E.2d at 429; *see also Dalessio v. Gallagher*, 414 N.J.Super. 18, 997 A.2d 283, 286 (Ct.App.Div. 2010) (finding that a more restrictive view would "effectively read one of the predicates for home state jurisdiction . . . out of the statute").

This interpretation both advances the primary purpose of the UCCJEA and is consistent with this Court's previous application of this language. As this Court observed, the UCCJEA replaced the Uniform Child Custody Jurisdiction Act "to afford jurisdictional priority to the 'home state' in order to eliminate jurisdictional competition between courts regarding child custody." *Rosen*, 222 W.Va. at 406–07, 664 S.E.2d at 747–48 (2008). By interpreting "home state" to cast a wider net to capture a "home state" qualifier, the purpose of prioritizing home state status is served. To construe it otherwise would "narrow[ ] home state jurisdiction. . . . [and] increase the number of potentially conflicting jurisdictional disputes in competing jurisdictions." *Stephens*, 128 P.3d at 1029.

---

**18.** The creation of home state jurisdiction as the result of living with a "person acting as a parent," invokes a broader timeframe which must be reviewed to determine if that person qualifies as one "acting as a parent." W. Va.Code § 48–20–102(m) defines a "person acting as a parent" as a person, other than a parent, who:

(1) Has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, *within one year immediately before the commencement of a child custody proceeding*; and

(2) Has been awarded legal custody by a court or claims a right to legal custody under the law of this State.

(emphasis added). Given that petitioner did not identify the issue of whether respondent qualifies as a "person acting as a parent" in her assign-

ment of errors, we assume for the sake of discussion that she meets these criteria, but warn that each layer of the statute must be properly analyzed before a lower court may properly determine that it has jurisdiction.

**19.** *See Celebrezze*, 883 N.E.2d at 429 (finding West Virginia home state where children lived here six months "as of a date within the six-month period" before commencement of the proceeding); *Welch–Doden v. Roberts*, 202 Ariz. 201, 42 P.3d 1166, 1173–74 (Ct.App.2002) (same); *Stephens v. Fourth Jud. Dist. Ct.*, 331 Mont. 40, 128 P.3d 1026, 1029 (2006) (same); *Christine L. v. Jason L.*, 23 Misc.3d 1039, 874 N.Y.S.2d 794, 797 (N.Y.Fam.Ct.2009) (same); *In re L.S.*, 226 P.3d 1227, 1232 (Colo.App.2009) *overruled on other grounds*, 257 P.3d 201 (2011) (same); *Ogawa v. Ogawa*, 125 Nev. 660, 221 P.3d 699, 704 (2009) (same).

In fact, this Court has applied precisely this analysis previously. In *Rosen, supra,* this Court upheld the circuit court's conclusion that West Virginia was the home state of the subject children where, although the children had moved to Ohio four months before the child custody proceeding was commenced, West Virginia was the children's home state within the six months preceding the divorce action. *Id.* at 407, 664 S.E.2d at 748. Noting that such determination eliminated jurisdictional competition, this Court found that the conclusion that West Virginia was the children's home state was "easily reached." *Id.* We therefore hold that to determine whether a state qualifies as a child's "home state" for purposes of determining initial jurisdiction under W. Va.Code § 48-20-201(a), a court must analyze whether any state qualified as the child's "home state" at any time within the six months immediately preceding commencement of the action.

However, this holding, while instructive, does little to elucidate the jurisdictional question in the instant case without further examination of additional issues. The record demonstrates that the children lived in Mississippi most of their lives—from birth until October, 2008, when they began residing with Gary and Armilda M. After the guardianship proceeding was initiated, however, they returned to Mississippi in January, 2009, where they then lived with their mother until June, 2010.

As of June, 2010, the nature of the children's living arrangements is unclear. The children began their "summer visit" in June, 2010, until sometime in late-August, at which point they were returned to Louisiana for four weeks, and then returned to West Virginia on October 4, 2010. During the operative period—August 18, 2010 to February 18, 2011—the children lived in West Virginia only approximately four and a half months—from October 4, 2010 until February 18, 2011, insufficient in and of itself to create home state status. With respect to this timeline, petitioner contends simply that wherever her residence was constituted the children's home state. Respondent maintains that the "summer visit" was the beginning of a continuous presence in West Virginia, briefly interrupted by a return to Louisiana. The circuit court, ignoring the "consecutive" requirement in the UCCJEA, takes a cumulative approach to determining the children's presence in the state, but nevertheless finds that they had no home state.

None of these analyses is correct. First, petitioner confuses the issues of "residency" or "domicile" with the plainly worded language of the UCCJEA. The UCCJEA require that a child have "live[d]" with a parent or person acting as a parent.[20] Petitioner's contention that "home state" status follows the residency of the parent is nonsensical; if that were the case, the UCCJEA would be rendered meaningless. On the other hand, respondent summarily ignores the non-consecutive nature of the children's presence in West Virginia. Both the parties and the circuit court merely hint at (without providing any legal analysis) the central issue precluding a proper home state analysis— whether any of these various interruptions in any potential six-month consecutive period constituted a "temporary absence." The UCCJEA allows for an interruption in the six month consecutive time period if such interruption is temporary: "A period of temporary absence of any of the mentioned persons is part of the period." W. Va.Code § 48-20-102(g).

As a threshold matter, however, it must first be determined precisely when in August, 2010, Kelly moved to Louisiana and when the children returned to live with her. The six-month period under scrutiny extends back to August 18, 2010. If the children had

---

**20.** As the Supreme Court of Texas noted:

The word "lived" strongly connotes physical presence. *See* Webster's Third New International Dictionary 1323 (1961) (defining "live" as "to occupy a home"). We think it significant that the Legislature chose the word "lived" as opposed to "resided" or "was domiciled." The test for "residence" or "domicile" typically involves an inquiry into a person's intent.

*Powell v. Stover,* 165 S.W.3d 322, 326 (2005); *see also Sajjad v. Cheema,* 428 N.J.Super. 160, 51 A.3d 146, 154 (App.Div.2012); *Escobar v. Reisinger,* 133 N.M. 487, 64 P.3d 514, 517 (Ct.App. 2003); *Dekinderen v. Dekinderen,* 2010 WL 99269, *3 (Mich.Ct.App.2010).

a home state at any time between August 18, 2010, and February 18, 2011, that state has jurisdiction. At no time was evidence adduced—nor did anyone inquire—as to what date in August, 2010, Kelly moved from Mississippi to Louisiana and when the children returned there to live with her. There was no analysis of whether the June, 2010, "summer visit" was a temporary absence from Mississippi, whether the return to Louisiana was a temporary absence from West Virginia, or whether the October, 2010, return to West Virginia was a temporary absence from Louisiana. Without evidence on the critical factual issue during the operative time period and a proper "temporary absence" analysis as to each of the applicable "absences" from the states in contention, a proper "home state" analysis cannot be performed.

As such, upon remand, this analysis should be conducted as set forth hereinabove and, in the event that the circuit court still concludes the children have no home state, the court must continue to analyze the remainder of the statute before exercising jurisdiction.

## 2. Significant Connection Jurisdiction

If after proper factual development and analysis, the circuit court concludes that the children had no home state as of the commencement of the proceeding, the court must proceed to analyze the remainder of the statute. If there is no home state, Section 201(a)(2) confers jurisdiction if there is no home state *and*:

(A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and

(B) Substantial evidence is available in this State concerning the child's care, protection, training and personal relationships[.]

While this subsection would on its face appear to be applicable given the amount of

time the children have spent with various family members in Wayne County, their school attendance and community integration, the circuit court must assess whether there is "[s]ubstantial evidence" available in Wayne County. The entire basis for the guardianship petition—the allegations of abuse and neglect—occurred outside of West Virginia. Moreover, Kelly lives and works in Louisiana, along with her family and her deceased husband's father—all of whom she referenced as providing substantial support for her and the children. The entire family lived in Mississippi for greater than ten years, with the exception of the two-month stay in West Virginia in 2008, until the children were twelve-years-old and ten-years old, respectively, and last lived there with their mother in May, 2010. Certainly the court's wholesale disregard of the abuse and neglect allegations *because* they occurred outside of West Virginia may militate against finding jurisdiction under this section. As such, if there is some *other court* which has both a "significant connection" to the child and parent and "substantial evidence" is available there, it would have jurisdiction and West Virginia would not. The question then becomes whether Louisiana or Mississippi is that "other state" which has both a "significant connection" to the child and parent and where there exists "substantial evidence."

## 3. Declination and Default Jurisdiction

Failing "home state" jurisdiction or "significant connection" jurisdiction, the analysis turns next to "declination" jurisdiction, which is inapplicable here. There is no evidence that any other court has declined jurisdiction of the custody issues presented before the circuit court.[21]

As to "default" jurisdiction, section 201(a)(4) confers jurisdiction if there is no state which would have jurisdiction under any of the other sections. At first blush, the existence of this "catch-all" would seem to

---

21. The court acknowledged, albeit briefly, that the statute probably still requires that because as a family unit, they did not live here, that I need to inquire of Mississippi, do they still want to continue jurisdiction over this case.... but I don't believe that the Mississippi Courts would retain and continue jurisdiction.

Insofar as the record would reveal, no inquiry of any other State occurred. W. Va.Code § 48–20–110(a) provides that "[a] court of this State may communicate with a court in another state concerning a proceeding arising under this chapter."

make the immediately preceding argument academic, i.e. if there is no jurisdiction in West Virginia under any of the other subsections, 201(a)(4) confers jurisdiction. However, 201(a)(4) provides jurisdiction—not if *this* state does not have jurisdiction under any of the other subsections, but rather, only if "[n]o *court of any other state* would have jurisdiction" under the other subsections. W. Va.Code § 48–20–201(a)(4) (emphasis added). Until the circuit court determines if any such other court has proper jurisdiction of this matter, it cannot assume jurisdiction on the basis of W. Va.Code § 48–20–201(a)(4).

The foregoing discussion illustrates the complete failure of the parties and circuit court to properly identify and perform the analysis required to exercise jurisdiction over this child custody proceeding. Suffice it to say, however, that the "cumulative" presence basis set forth by the circuit court as conferring jurisdiction is patently inadequate. Moreover, the circuit court's reference to the children's mere presence is likewise an improper basis upon which to exercise jurisdiction as plainly stated in the UCCJEA: "Physical presence of, or personal jurisdiction over, a party or a child is not necessary or *sufficient* to make a child custody determination." W. Va.Code § 48–20–201(c) (emphasis added).

As such, in absence of the proper factual and legal predicate, we find that it was error for the circuit court to exercise jurisdiction over this matter. Upon remand, the circuit court is directed to adduce sufficient evidence to permit it to determine if it had jurisdiction at the time of commencement of this child custody proceeding consistent with the above analysis before it may proceed to the merits of the guardianship petition.[22]

### B. Requirement of Unfitness

The foregoing jurisdictional error notwithstanding, this Court also finds that the circuit court committed error by divesting a biological parent of custody in absence of a finding of unfitness, as asserted in petitioner's second assignment of error. We find that this error was occasioned by the circuit court's refusal to hear evidence of the abuse and neglect allegations underlying the petition for guardianship, which we likewise find to be an abuse of discretion.[23]

With respect to the rights of natural parents, this Court has held:

"In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions." Syl. Pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).

Syl. Pt. 6, *In re Antonio R.A.*, 228 W.Va. 380, 719 S.E.2d 850 (2011). We have further held that these rights "are not just constructs of the courts, but that they are basic liberties secured by the state and federal constitutions." *In re Abbigail Faye B.*, 222 W.Va. 466, 478, 665 S.E.2d 300, 312 (2008). With regard to the basis upon which these fundamental liberties may be stripped from a parent, this Court has held:

"A parent has the natural right to the custody of his or her infant child and, unless the parent is an unfit person because of misconduct, neglect, immorality,

---

**22.** The Court is cognizant of the substantial amount of time that has lapsed during the pendency of this appeal. However, W. Va.Code §§ 48–20–102(g) and 201(a)(1) does not permit consideration of where the children lived subsequent to commencement of the proceeding. Therefore, the location of the children at all times subsequent to the commencement of this particular action is obviously irrelevant for purposes of determining whether the circuit court had jurisdiction in the first instance to make the permanent guardianship determination at issue.

**23.** While neither party assigned this specific ruling as error, this does not affect this Court's ability to determine it to be error: "[I]t is within the authority of this Court to 'sua sponte, in the interest of justice, notice plain error.'" *Cartwright v. McComas*, 223 W.Va. 161, 164, 672 S.E.2d 297, 300 (2008) (quoting Syl. Pt. 1, in part, *State v. Myers*, 204 W.Va. 449, 513 S.E.2d 676 (1998)). Moreover, we find that this issue is a "subsidiary question fairly comprised" within petitioner's assignment of error regarding the absence of a finding of unfitness. W. Va. R.App. Proc. 10(c)(3).

abandonment or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts." Syllabus, *Whiteman v. Robinson*, 145 W.Va. 685, 116 S.E.2d 691 (1960).

Syl. Pt. 7, *Antonio R.A., supra*.[24]

■ However, in the instant case, application of the foregoing holdings to summarily reverse the circuit court on the basis that no finding of unfitness was made merely begs the question. Allegations of unfitness precipitated the proceeding in the first instance. To simply restore custody to petitioner, without more, would violate our holding that " '[a]lthough parents have substantial rights that must be protected, the primary goal ... in all family law matters ... must be the health and welfare of the children.' Syllabus point 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996)." Syl. Pt. 10, *In re Abbigail Faye B.*, 222 W.Va. 466, 665 S.E.2d 300 (2008).

No testimony was taken from the children and the guardian ad litem was dismissed without testimony or a report; the circuit court made clear to counsel that it did not intend to hear testimony from any source regarding these allegations. After hearing evidence regarding the living situation of petitioner, the circumstances surrounding the children's presence in West Virginia, and considerable testimony regarding petitioner's financial stability or lack thereof, the circuit court proceeded to simply determine that the children's "best interests" were served by remaining in the "stable, safe and caring" home of respondent and grant permanent guardianship on that basis alone. The circuit court noted that petitioner "maintains a lifestyle that is not conducive to the best interest of her children," "provides an unstable environment" and was guilty of "educational neglect." However, the circuit court quite pointedly noted that it "cannot find that she is an unfit mother on the basis of evidence that may have been presented from other jurisdictions."

24. Respondent cites this syllabus point in support of her position that the circuit court properly found that petitioner "voluntarily transferred and relinquished her parental rights." First, the circuit court made no such finding. Moreover, we find that at no time in the proceedings below did respondent sufficiently assert voluntary relinquishment of custody as a basis for her petition for guardianship. Rather, all reference to Kelly's alleged financial neglect of the children while they were in West Virginia and their periodic stays in West Virginia were cast as a basis for the court to determine that Kelly provided an unstable home and was generally neglectful and that therefore, the children's "best interests" were served by granting guardianship to respondent. Certainly, the circuit court's order makes no findings whatsoever with respect to voluntary relinquishment of custody.

Regardless, we note that the mere fact that petitioner had temporarily transferred custody does not, in and of itself, evidence an intention to surrender her custodial rights as a natural parent. In fact, the temporary nature of the "Provisional Custody by Mandate" and her express revocation of same suggests just the opposite. Additionally, Kelly's attempt to return to Louisiana with the children—which was undisputed by respondent—certainly undermines such a contention. Finally, although the circuit court did not undertake more particularized findings regarding respondent's retention of the children, it is clear that one cannot wrongfully abscond with or withhold children and then argue that they have been "abandoned" by their parent. Similarly, from a jurisdictional standpoint, the UCCJEA contain provisions specifically aimed at preventing a petitioner from benefitting from such actions. *See* W. Va.Code § 48–20–208 (permitting a court to decline jurisdiction where a person seeking to invoke its jurisdiction has engaged in "unjustifiable conduct").

Despite having made no express voluntary relinquishment claims below, before this Court respondent argues that she is the "psychological parent" of the children. Citing this Court's decision in *In the Interest of Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990), respondent argues the rights of a natural parent erode if the parent places the child into another's custody such that they become the psychological parent and thereafter do not adequately maintain contact with and provide for the child. However, respondent does not acknowledge the commensurate requirement that such psychological parent relationship must "be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian." Syl. Pt. 3, *In re Clifford K.*, 217 W.Va. 625, 619 S.E.2d 138 (2005). We find that the only express relinquishment of custody was to *Sally S. and not to respondent*, and was for a limited duration per the language of the Mandate and the undisputed testimony; therefore, respondent's argument is without merit.

■ It appears the circuit court believed that the guardianship statute itself permitted transfer of guardianship based solely on what was in the best interests of the children, without consideration of the underlying allegations of abuse and neglect. W. Va.Code § 44–10–3(a) provides:

> The circuit court or family court of the county in which the minor resides, or if the minor is a nonresident of the State, the county in which the minor has an estate, may appoint as the minor's guardian a suitable person. The father or mother shall receive priority. However, in every case, the competency and fitness of the proposed guardian and the welfare and best interests of the minor shall be given precedence by the court when appointing the guardian.

However, as we have noted, "it is clear that these statutes were originally drafted, more than one hundred years ago, with an eye towards the administration of trusts and estates. The statutes simply do not adequately address guardianship issues in modern-day, custodial matters." *Antonio R.A.* at 385 n. 3, 719 S.E.2d at 855 n. 3. Regardless, certainly nothing in the statute permits a court to allow abuse and neglect allegations to give way to a simple "best interests" analysis. Moreover, the circuit court's rationale that respondent provided a "more stable" home flies directly in the face of this Court's admonition that

> " '[w]hile courts always look to the best interests of the child in controversies concerning his or her custody, such custody should not be denied to a parent merely because some other person might possibly furnish the child a better home or better care.' Syllabus point 3, *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 (1975)." Syl. Pt. 12, *In re Abbigail Faye B.*, 222 W.Va. 466, 665 S.E.2d 300 (2008).

Syl. Pt. 8, *Antonio R.A., supra.*

■ This Court has previously outlined the proper handling of a matter such as this. In Syllabus Point 7 of *In re Abbigail Faye B.*, 222 W.Va. 466, 665 S.E.2d 300 (2008), we held:

> Rule 48a(a) of the West Virginia Rules of Practice and Procedure for Family Court requires that if a family court presiding over a petition for infant guardianship brought pursuant to W. Va.Code § 44–10–3 learns that the basis for the petition, in whole or in part, is an allegation of child abuse and neglect as defined by W. Va. Code § 49–1–3, then the family court is required to remove the petition to circuit court for a hearing thereon. Furthermore, "[a]t the circuit court hearing, allegations of child abuse and neglect must be proven by clear and convincing evidence." West Virginia Rules of Practice and Procedure for Family Court 48a(a).

*Abbigail Faye B.* presented a very factually similar scenario, wherein grandparents filed a guardianship petition which contained allegations of abuse and neglect. The grandparents contended that the circuit court erred in requiring them to prove abuse and neglect by clear and convincing evidence. *Id.* at 473, 665 S.E.2d at 307. In rejecting the grandparents' argument, we held that "because the guardianship petition alleged that the subject child had been abused and neglected, the circuit court was *obligated* to consider the evidence presented in accordance with the standard of proof for abuse and neglect cases generally, *i.e.*, clear and convincing evidence[.]" *Id.* at 477, 665 S.E.2d at 311 (emphasis added). Moreover, this Court held that "[d]ivesting a child's biological parent of his/her guardianship, or custody, is a very serious matter," 222 W.Va. at 478, 665 S.E.2d at 312 (footnote omitted), and that "any party seeking to interfere with such rights must bear a heavy burden." *Id.* In the instant case, the circuit court did not simply relieve respondent of her appropriate burden, but erroneously refused to hear evidence regarding the critical issue necessary to make any sort of determination regarding the children's best interests—whether they were subject to abuse and/or neglect while living with petitioner.

Although we find it to be erroneous to simply disregard the underlying abuse and neglect allegations which formed the basis of this guardianship petition and divest petitioner of custody of her children without any finding of unfitness, we recognize that the circuit court stated that it lacked "jurisdic-

tion" to hear evidence regarding out-of-state abuse and neglect allegations. However, we find this rationale without a proper basis in law or fact.[25]

First, the circuit court had previously handled precisely the same "out-of-state" allegations involving precisely the same parties in 2008; in that event, rather than simply declaring that it could not consider such allegations, the circuit court ensured that referral was made to the proper child protective services agency in Mississippi. Why the circuit court did not treat these new allegations in precisely the same manner is unclear.

Secondly, although the circuit court equivocated several times about making an out-of-state referral to the proper investigative agency, such referral was not necessarily essential to determination of the issue of whether abuse and neglect had occurred. Both Rule 48a(b) of the Rules of Practice and Procedure for Family Court and Rule 13(b) of the Rules of Practice and Procedure for Minor Guardianship Proceedings make utilization of the investigative procedures set forth in Rule 3a of the Rules of Procedure for Child Abuse and Neglect Proceedings discretionary: "Upon removal of the [ ] guardianship petition, the circuit court may utilize the investigative and mandamus process and related procedures set forth in Rule 3a of the Rules of Procedure for Child Abuse and Neglect Proceedings if the court deems it necessary or appropriate under the circumstances presented." Simply put, the perceived obstacle of the allegations taking place out-of-state did not necessarily preclude a finding, by clear and convincing evidence, of abuse and neglect; such proof is not exclusively adduced by virtue of a child protection investigation. To that extent, however, had

the circuit court determined that an investigation was needed, certainly it could proceed in that fashion as authorized by the Rules.[26]

Accordingly, we find the circuit court's refusal to consider the evidence of abuse and neglect underlying this guardianship proceeding and its transfer of custody of the minor children from a natural parent without a finding of unfitness to be erroneous.

Upon remand, this matter requires the parties' and the circuit court's most immediate attention:

> This Court has consistently recognized child abuse and neglect cases as high priority. *See* Syl. Pt. 1, in part, *In re Carlita B.*, 185 W.Va. [613], 615, 408 S.E.2d [365], 367 [ (1991) ] ("Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security").

*In re Edward B.*, 210 W.Va. 621, 634 n. 20 558 S.E.2d 620, 634 n. 20 (2001). Similarly, because allegations of abuse and neglect have been raised, the circuit court is directed to *immediately:* (1) undertake efforts to seek an *expedited* abuse and neglect investigation by the appropriate local child protection authority where Kelly resides; and (2) undertake such steps as are necessary to make an appropriate jurisdictional determination, including but not limited to availing itself of the communication encouraged by W. Va. Code § 48–20–110(a) with any other potential jurisdiction indicated pursuant to the UCCJEA.

 Furthermore, this Court is particularly troubled by not only the utterly

---

**25.** Moreover, we find that this error gave rise to the commensurately erroneous dismissal of the guardian ad litem without testimony or a report. In an abuse and neglect proceeding, this Court found that an "error of substantial proportion was committed when the guardian ad litem was not provided the opportunity to orally articulate his client's best interests." *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995). Although this case was procedurally presented as a guardianship petition, when such a petition is founded in abuse and neglect allegations, lower courts would be wise to heed the directives issued by this Court as pertain to abuse and ne-

glect proceedings. In particular, with respect to guardians ad litem in abuse and neglect proceedings, we have stated that "[t]here is a clear legislative directive that guardians ad litem and counsel for both sides be given an opportunity to advocate for their clients[.]" *Id.* at 453, 460 S.E.2d at 699.

**26.** From the record it appears that a representative of the Wayne County Department of Health and Human Services was present for at least some portion of the hearing, but did not make an appearance.

deficient compliance with our precedent and the plainly applicable statutes, but the disruption to these children's lives which these errors have created. The Court again notes the substantial lapse of time which has occurred since entry of the circuit court's order granting permanent guardianship and the unfortunate position in which this places the subject children after having presumably become immersed in the Wayne County community.[27] Nevertheless, we cannot allow the parties to continue to operate under a plainly erroneous order which sets forth no demonstrable jurisdiction to have been entered in the first instance. We are, however, mindful that

> [i]t is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

Syl. Pt. 3, *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991). We therefore order that, upon remand, the circuit court is to establish immediately a transitional plan which provides for gradual restoration of custody of the children to Kelly R., to occur throughout the remainder of the 2012 school semester, resulting in complete reunification of the children with Kelly R. by the commencement of the January, 2013 school semester in the local school district where Kelly currently resides. Such plan should include holiday visitation. In the event that the circuit court, on remand, determines that it has jurisdiction and a record is made that establishes the allegations of abuse or neglect, the circuit court may then determine whether a guardianship is warranted and may act accordingly.

## IV. CONCLUSION

We therefore reverse the May 23, 2011, order of the Circuit Court of Wayne County and restore Kelly R.'s full custodial rights, following a gradual transitional period as outlined above. We further remand this case for an expedited determination of the threshold jurisdictional issue and further proceedings, as appropriate, consistent with this opinion.[28]

Reversed and remanded.

Chief Justice KETCHUM, deeming himself disqualified, did not participate in the decision of this case.

---

27. The Court notes that had petitioner availed herself of more expedient remedies, such as a writ of prohibition, to assert the circuit court's lack of jurisdiction, the potential detrimental impact on the children may have been mitigated. "The urgency of addressing problems regarding subject-matter jurisdiction cannot be understated because any decree made by a court lacking jurisdiction is void." *State ex rel. TermNet Merchant Services, Inc. v. Jordan*, 217 W.Va. 696, 700, 619 S.E.2d 209, 213 (2005) (citing Syllabus Point 5, *State ex rel. Hammond v. Worrell*, 144 W.Va. 83, 106 S.E.2d 521 (1958), *rev'd on other grounds, Patterson v. Patterson*, 167 W.Va. 1, 277 S.E.2d 709 (1981)); *see also Whittaker v. Whittaker*, 228 W.Va. 84, 717 S.E.2d 868 (2011).

28. As a result of the lapse of time, we note that one of the children is now fourteen. To that end, and in the event that the circuit court determines that it has jurisdiction and that petitioner is "unfit," we would direct the court to Syllabus Point 5 of *Antonio R.A., supra:*

> A family or circuit court's authority to appoint a suitable person as a guardian for a minor, including a minor above the age of fourteen, is derived from West Virginia Code § 44–10–3 (2010), which grants courts discretion in determining when the appointment of a guardian for a minor is appropriate. West Virginia Code § 44–10–4 (2010), which entitles a minor above the age of fourteen to nominate his or her own guardian, applies only after a court has determined, pursuant to West Virginia Code § 44–10–3, that a particular circumstance warrants the appointment of a guardian.